1

2

3

4

5

6

7

8

9

10                    UNITED STATES DISTRICT COURT

11                   SOUTHERN DISTRICT OF CALIFORNIA

12

13   IN RE ATTORNEY LYNN HUBBARD        )   Case No. 12-cv-1975-L(WMc)
     III,                               )
14                                      )   **FINDINGS OF FACT AND**
                     Respondent.        )   **CONCLUSIONS OF LAW**
15                                      )
                                        )
16                                      )
                                        )
17                                      )
                                        )
18   _____)

19        On August 8, 2012, the Standing Committee on Discipline for the Southern District of

20   California ("Standing Committee") commenced this disciplinary action against Attorney Lynn

21   Hubbard III for alleged professional misconduct.  The alleged professional misconduct occurred

22   in the underlying Americans with Disabilities Act ("ADA") action, *Hubbard v. Plaza Bonita,*

23   *LP, et al.*, 09-cv-1581-JLS(WVG).  The Standing Committee seeks to suspend Mr. Hubbard for

24   a period of one year from the practice of law in this district.

25        On December 10, 2012, Mr. Hubbard filed an opening trial brief, and on December 17,

26   2012, the Standing Committee filed a responsive trial brief.  On December 18, 2012, a one-day

27   bench trial was held.  Based on the trial, stipulations, and the admitted evidence, the Court issues

28   the following findings of fact and conclusions of law.

1  **I.      FINDINGS OF FACT[1]**

2        1.      Donna Gin, counsel for Hot Topic, Inc.,[2] believed that Barbara Hubbard had in

3  fact signed the settlement agreement that Mr. Hubbard's office transmitted on December 8,

4  2009.  (*See* Pet'r's Ex. 5 ¶ 6.)

5        2.      Ms. Gin had her client sign the settlement agreement transmitted on December 8,

6  2009, unaware that Barbara Hubbard[3] had died on November 13, 2009 and thus could not have

7  signed the settlement agreement.  (*See* Pet'r's Ex. 5 ¶¶ 6, 8–9.)

8        3.      Had Ms. Gin known about Barbara Hubbard's death—as a named plaintiff in the

9  underlying action, an obviously material fact—at any time during the negotiation of the

10  settlement, she would have immediately halted settlement discussions and notified her client of

11  the development.  (*See* Pet'r's Ex. 5 ¶¶ 8–9.)

12        4.      By transmitting the settlement agreement to Ms. Gin on December 8, 2009, which

13  was purportedly signed by Barbara Hubbard, Mr. Hubbard attempted to mislead opposing

14  counsel into believing that Barbara Hubbard was alive.  Foremost, during Mr. Hubbard's

15  testimony, when asked what his intention was in approving the settlement agreements, he was

16  non-responsive.  That is, he neither confirmed nor denied that it was his intention to mislead

17  opposing counsel.  Aside from his non-responsiveness, the Court finds that Mr. Hubbard's

18  testimony lacks credibility, primarily because of Mr. Hubbard's pattern of inconsistent

19  statements as well as his inability to adequately explain his failure to inform opposing counsel of

20  Barbara Hubbard's death in a reasonably timely manner.

21        For example, Mr. Hubbard testified that he did not inform United States Magistrate Judge

22  William V. Gallo that Barbara Hubbard was "gravely ill" during the February 25, 2010

23

24        [1] The Standing Committee introduced fifteen exhibits, and called two witnesses to testify
during trial.  Mr. Hubbard introduced no exhibits, and only called himself to testify during trial.
25  It is worth noting that Mr. Hubbard originally included Kaina Schukei—who, in retrospect, is an
important player in the alleged misconduct that occurred in the underlying action—on his
26  witness list, but Mr. Hubbard ultimately did not call her to testify during trial.

27        [2] Hot Topic is one of numerous defendants in the underlying action.

28        [3] Barbara Hubbard is the plaintiff in the underlying action.  She died on November 13,
2009.  (Pet'r's Ex. 1.)  Barbara Hubbard is also Mr. Hubbard's mother.

1   settlement conference, but in an objection to an order to show cause ("OSC Objection")

2   submitted to United States District Judge Janis L. Sammartino, he stated that "Attorney Hubbard

3   told Magistrate Gallo on February 25, 2010, that he had heard that his mother [Barbara Hubbard]

4   was 'gravely ill.'" (Pet'r's Ex. 9 at 5:10–11.)  Similarly, during his testimony, Mr. Hubbard

5   denied telling Judge Gallo that he had Barbara Hubbard sign numerous blank settlement

6   agreements before her death, but in the same aforementioned objection, he stated that "Attorney

7   Hubbard told Magistrate Gallo on February 25, 2010, that his mother, Barbara, had signed

8   numerous blanks [sic] settlement agreements, which the parties and court agree were never

9   used." (*Id.* at 5:20–22.)  These are not exclusive examples of Mr. Hubbard's inconsistencies.

10          5.      At the February 25, 2010 settlement conference, Mr. Hubbard told Judge Gallo

11   that he had heard Barbara Hubbard was ill.  (*See* Pet'r's Ex. 9 at 5:10–11.)  Mr. Hubbard also

12   failed to disclose that he had personally observed Barbara Hubbard's deteriorating condition just

13   before her death.  (*See* Pet'r's Ex. 6 ¶¶ 3–10.)

14          6.      By transmitting the settlement agreement to David Peters, counsel for Flava

15   Enterprises, Inc. ("Flava")[4] on December 9, 2009, which was purportedly signed by Barbara

16   Hubbard, Mr. Hubbard attempted to mislead opposing counsel into believing that Barbara

17   Hubbard was alive.  The Court makes this finding for the same reasons that it found above that

18   Mr. Hubbard attempted to mislead counsel for Hot Topic.

19          7.      At the February 25, 2010 settlement conference, Mr. Hubbard informed Judge

20   Gallo that he was considering Chris Kohler, one of Mr. Hubbard's other clients, to substitute in

21   as the plaintiff in place of Barbara Hubbard in the underlying action.  (*See* Pet'r's Ex. 8 at

22   10:3–17; *see also* Pet'r's Ex. 6 ¶¶ 13–20.)  Mr. Peters' testimony also supports this factual

23   finding.[5]

24          8.      At the February 25, 2010 settlement conference, Mr. Hubbard intended to mislead

25

26          [4] Flava is another defendant in the underlying action.

27          [5] Mr. Hubbard brought up concerns about Mr. Peters' potential bias during trial.  The
28   Court recognizes these concerns.  However, the Court finds that Mr. Peters' testimony regarding
     the pertinent issues in this case is credible.

1    the court that he had not observed firsthand Barbara Hubbard's deteriorating condition in the

2    days before her death.  On this factual issue, Mr. Hubbard once again took contradictory

3    positions.  In the OSC Objection, Mr. Hubbard unequivocally admits that "Attorney Hubbard

4    told Magistrate Gallo on February 25, 2010 that *he had heard* his mother was 'gravely ill.'"

5    (Pet'r's Ex. 9 at 5:10–11 (emphasis added).)  However, Mr. Hubbard testified that that never

6    happened.  Stating that Mr. Hubbard merely "had heard" Barbara Hubbard was gravely ill

7    strongly suggests that he did not personally observe her physical condition, but rather heard

8    about her physical condition through a third person.  (*See id.*)

9        9.    Before the February 25, 2010 settlement conference, the decision had been made

10   that Mr. Hubbard's father, and not some other client of Mr. Hubbard's, would assume the role of

11   plaintiff in the underlying action at the time of Barbara Hubbard's death.  In a declaration, Mr.

12   Hubbard stated that after being informed of Barbara Hubbard's death, he called his father.

13   (Pet'r's Ex. 6 ¶¶ 12–13.)  At that time, Mr. Hubbard concluded that his father inherited Barbara

14   Hubbard's causes of action, and based on that conclusion, Mr. Hubbard asked his father "what

15   he wanted to do."  (*Id.* ¶¶ 15–17.)  He informed his father that previous settlements needed to be

16   finalized, and received instruction from his father to "go ahead and 'finish up' the lawsuit."  (*Id.*

17   ¶¶ 18–19.)  Mr. Hubbard stated in the declaration that he and his father "agreed" that Mr.

18   Hubbard would represent his father's interest in the underlying action, and thereafter, Mr.

19   Hubbard's father went on to ratify and consent to Mr. Hubbard's office signing settlement

20   agreements.  (*Id.* ¶¶ 20–23.)  The declaration does not mention Chris Kohler.  (*See id.* ¶¶ 12–23.)

21   This leads the Court to find that Mr. Hubbard decided that his father would assume the role of

22   plaintiff in the underlying action months before the February 25, 2010 settlement conference.

23       10.    At the February 25, 2010 settlement conference, Mr. Hubbard intended to mislead

24   the court that no decision had been made as to who would assume control of the underlying

25   action following Barbara Hubbard's death.  Mr. Peters testified that Mr. Hubbard represented

26   that either Chris Kohler or Mr. Hubbard's father would replace Barbara Hubbard in the

27   underlying action during the settlement conference.  Mr. Hubbard also testified that when Judge

28   Gallo asked what his intentions were regarding substituting the plaintiff in the underlying action,

1   he answered that he might substitute Chris Kohler.  However, in light of the factual findings

2   above, Mr. Hubbard's representations during the settlement conference were misleading.  Taking

3   into account the discussion and agreement between Mr. Hubbard and his father following

4   Barbara Hubbard's death, there was no other evident purpose to mention Chris Kohler during the

5   settlement conference other than to mislead the court and the other participants.

6          11.     At the February 25, 2010 settlement conference, Mr. Hubbard represented that

7   Barbara Hubbard had signed numerous blank settlement agreements before her death, but failed

8   to disclose that the "signed" settlement agreements sent to opposing counsel did not bear

9   Barbara Hubbard's actual signature, but rather someone else's.  Mr. Hubbard testified that he did

10  not tell Judge Gallo that Barbara Hubbard had signed numerous settlement agreements before

11  her death.  Rather, he explained that he told Judge Gallo that Barbara Hubbard had signed three

12  documents before her death, two of which involved other cases and the other involved a banking

13  matter.  However, in the OSC Objection, Mr. Hubbard unequivocally took the position that he

14  "told Magistrate Gallo on February 25, 2010, that his mother, Barbara, had signed numerous

15  blanks [sic] settlement agreements, which the parties and court agree were never used."  (Pet'r's

16  Ex. 9 at 5:20–21.)  Furthermore, Mr. Peters and Ms. Gin both testified that they had no reason to

17  suspect that the signatures on the settlement agreements were not actually Barbara Hubbard's,

18  and that they believed that the signatures on the settlement agreements were actually Barbara

19  Hubbard's.

20         In sum, the Court finds that Mr. Hubbard represented that Barbara Hubbard had signed

21  numerous blank settlement agreements before her death.  Additionally, the Court finds that Mr.

22  Hubbard failed to disclose to the court, Mr. Peters, and Ms. Gin the material fact that the

23  signature in the settlement agreements did not bear Barbara Hubbard's actual signature prior to

24  or at the February 25, 2010 settlement conference.

25         12.    Mr. Hubbard intended to mislead the court about who had signed the December 9,

26  2009 settlement agreement faxed to Mr. Peters.  Mr. Hubbard testified that the fee agreement

27  with Barbara Hubbard authorized him and possibly his firm to simulate Barbara Hubbard's

28  signature.  A declaration of Mr. Hubbard's also states that he received authorization from his

1  father shortly after Barbara Hubbard's death to sign settlement agreements on Barbara

2  Hubbard's behalf.  (Pet'r's Ex. 6 ¶ 23.)  However, as discussed above, Mr. Hubbard nonetheless

3  represented to the court that Barbara Hubbard actually signed numerous blank settlement

4  agreements before her death.  The totality of the evidence compels the Court to find that Mr.

5  Hubbard intended to mislead the court as well as the other parties involved in the underlying

6  action as to who actually signed the settlement agreements, including the one faxed to Mr. Peters

7  on December 9, 2009.

8

9  **II.    CONCLUSIONS OF LAW**

10        1.      Civil Local Rule 83.4(a) lays out the Code of Conduct for this district:

11              The United States District Court for the Southern District of California
              is committed to the highest standards of professionalism and expects
12             those standards to be observed by lawyers who practice before it.
              Compliance with high standards of professionalism depends primarily
13             upon understanding the value of clients, the legal system, the public,
              and lawyers of adhering to the voluntary standards.  Secondarily,
14             compliance depends upon reinforcement by peer pressure and public
              opinion, and finally, when necessary, by enforcement by the courts
15             through their powers and rules already in existence.  This code of
              conduct is not intended to be a set of rules that lawyers can use to incite
16             ancillary litigation on the question whether the standards have been
              observed by an adversary, but the court may take any appropriate
17             measure to address violations of the rules.

18        Rule 83.4(b) lays out the Standards of Professional Conduct for this district:

19              Every member of the bar of this court and any attorney permitted to
              practice in this court must be familiar with and comply with the
20             standards of professional conduct required of members of the State Bar
              of California, and decisions of any court applicable professional
21             conduct which are now adopted as standards of professional conduct of
              this court.  This specification will not be interpreted to be exhaustive of
22             the standards of professional conduct.  In that connection, the Code of
              Professional Responsibility of the American Bar Association should be
23             noted.  No attorney permitted to practice before this court will engage
              in any conduct which degrades or impugns the integrity of the court or
24             in any manner interferes with the administration of justice within the
              Court.
25        Following the guidance of Rule 83.4(b), the Court will consider the standards of

26  professional conduct set forth in American Bar Association Model Rules of Professional

27  Conduct ("ABA Model Rules"), the California Rules of Professional Conduct, and the State Bar

28  Act.

1    ABA Model Rule 3.3 imposes a duty of candor on attorneys towards the tribunal.  The

2  pertinent part of the rule states that a lawyer shall not knowingly "make a false statement of fact

3  or law to a tribunal or fail to correct a false statement of material fact or law previously made to

4  the tribunal by the lawyer."  ABA Model Rule 4.1(a) states that in the course of representing a

5  client, a lawyer shall not knowingly "make a false statement of material fact or law to a third

6  person."  ABA Model Rule 7.1 states that "[a] lawyer shall not make a false or misleading

7  communication about the lawyer or the lawyer's services."  That rule adds that "[a]

8  communication is false or misleading if it contains a material misrepresentation of fact or law, or

9  omits a fact necessary to make the statement considered as a whole not materially misleading."

10 Lastly, ABA Model Rule 8.4 states, in pertinent part, that "[i]t is professional misconduct for a

11 lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or]

12 engage in conduct that is prejudicial to the administration of justice."

13    Moving on to the California Rules of Professional Conduct, Rule 5-200 states that in

14 presenting a matter to a tribunal, a member of the California State Bar "[s]hall employ, for the

15 purpose of maintaining the cases confided to the member[,] such means only as are consistent

16 with truth."  Rule 5-220 states that "[a] member shall not suppress any evidence that the member

17 or the member's client has a legal obligation to reveal or to produce."

18    Finally, § 6101 of the State Bar Act states that "[t]he commission of any act involving

19 moral turpitude, dishonesty or corruption, whether the act is committed in the course of his

20 relations as an attorney or otherwise, and whether the act is a felony or misdemeanor or not,

21 constitutes a cause for disbarment or suspension."  Section 6068 states that it is the duty of an

22 attorney to "[t]o maintain the respect due to the courts of justice and judicial officers," and "[t]o

23 employ, for the purpose of maintaining the cases confided to him or her those means only as are

24 consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice

25 or false statement of fact or law."

26    Relying on the aforementioned professional rules of conduct, the Court finds that Mr.

27 Hubbard's intentionally deceptive and misleading conduct in the underlying action constitutes

28 unprofessional conduct that violates ABA Model Rules 3.3, 4.1(a), 7.1 and 8.4; California Rules

1   of Professional Conduct 5-200 and 5-220; and State Bar Act §§ 6101, 6068(b), and 6068(d).

2   Through these violations, Mr. Hubbard's conduct also constitutes unprofessional conduct in

3   violation of this district's Civil Local Rule 83.4.

4        2.    "[M]onetary sanctions may take the form of an award for attorney's fees to

5   opposing counsel." *ADO Fin., AG v. McDonnell Douglas Corp.*, 938 F. Supp. 590, 595 (C.D.

6   Cal. 1996). "The purpose of an attorney's fee award is to deter undesirable conduct." *Id.*

7   Specifically, the purpose of discipline brought under 28 U.S.C. § 1927 "may be to deter attorney

8   misconduct, or to compensate the victims of an attorney's malfeasance, or to compensate and

9   deter." *Haynes v. City & Cnty. of San Francisco*, 688 F.3d 984, 987 (9th Cir. 2012). In contrast

10   to the court's sanctioning power, in a disciplinary proceeding for unprofessional conduct, "the

11   question before the court is whether an attorney may continue to practice a profession imbued

12   with the public interest and trust." *Standing Comm. on Discipline v. Ross*, 735 F.2d 1168, 1170

13   (9th Cir. 1984). "The court must consider both the fitness of one of its officers and the need to

14   protect the public from an unqualified or unscrupulous practitioner." *Id.* (citing *Ex parte Wall*,

15   107 U.S. 265 (1883)). Additionally, "[i]n the federal system there is no uniform procedure for

16   disciplinary proceedings. The individual judicial districts are free to define the rules to be

17   followed and the grounds for punishment." *Id.*

18        Mr. Hubbard argues that imposing discipline for the professional misconduct in the

19   underlying action for which he has already been monetarily sanctioned amounts to double

20   punishment for the same conduct that is fundamentally unfair. (Resp't's Trial Brief 3:11–6:7.)

21   The Standing Committee opposes primarily on three grounds: (1) the purpose of the monetary

22   sanctions differ from the purpose of the discipline sought here; (2) Mr. Hubbard fails to provide

23   adequate explanation or legal authority to support his argument; and (3) there are no laws or

24   other applicable rules that prevent the Court from imposing discipline in addition to monetary

25   sanctions. (Pet'r's Trial Brief 4:4–6:14.) The Court agrees with the Standing Committee.

26        On June 13, 2011, Judge Gallo imposed a monetary sanction on Mr. Hubbard in the

27   underlying action under § 1927 and the court's inherent authority. (June 13, 2011 OSC Order

28   22:17–19.) He concluded that any sanctions to be imposed on Mr. Hubbard would be to deter

1   him from repeating any misconduct.  (*Id.* at 24:22–24.)  Mr. Hubbard's conduct was also

2   reported to the State Bar of California and referred to the Standing Committee.  (*Id.* at 25:6–18.)

3   In a subsequent order, the monetary sanction amounted to $55,224.05, "as sanctions for all of

4   Peters' work done in connection with the Barbara Hubbard signature falsification issue."  (Nov.

5   27, 2012 Sanctions Order 14:24–15:2.)

6        Though deterrence was a substantial reason for imposing the monetary sanctions, so was

7   compensation—compensation for attorney's fees incurred as a result of Mr. Hubbard's

8   misconduct.  Unlike the purpose for the monetary sanctions, the purpose of this disciplinary

9   proceeding is to consider Mr. Hubbard's fitness to practice in this district and to protect the

10  public from an unqualified or unscrupulous practitioner.  *See Ross*, 735 F.2d at 1170.  Thus, the

11  Court finds that imposing discipline in this proceeding would not amount to "double

12  punishment" and it also would not be fundamentally unfair to Mr. Hubbard.

13       Additionally, Civil Local Rule 83.5 specifically contemplates the possibility of imposition

14  of discipline in addition to other sanctions: "In the event any attorney engages in conduct which

15  may warrant discipline or other sanctions, the court or any judge may, *in addition to* initiating

16  proceedings for contempt under Title 18 U.S.C. and Rule 42, Fed. R. Crim. P., or *imposing other*

17  *appropriate sanctions*, refer the matter to the disciplinary body of any court before which the

18  attorney has been admitted to practice."  Civ. L.R. 83.5 (emphasis added).  Judge Gallo imposed

19  a monetary sanction that he deemed appropriate, and then acted in accordance with Rule 83.5 by

20  referring the matter to the Standing Committee.  Thus, this disciplinary proceeding following the

21  monetary sanctions is actually aligned with the procedures and within the scope of Rule 83.5.

22       To summarize, the Court may impose a disciplinary punishment in this proceeding for

23  Mr. Hubbard's professional misconduct even if he was previously monetarily sanctioned for that

24  same misconduct.

25       3.      In light of the foregoing factual findings and legal conclusions, the Court finds that

26  a one-year suspension from the practice of law in the Southern District of California is

27  appropriate.

28  //

1  **III.**    **CONCLUSION**

2       Based on the foregoing, the Court finds that Mr. Hubbard engaged in professional

3  misconduct in the underlying action, and imposes a one-year suspension on Mr. Hubbard from

4  the practice of law in the Southern District of California.  The Clerk of the Court shall send a

5  copy of this order to the State Bar of California.

6       **IT IS SO ORDERED**.

7

8  DATED: February 4, 2013

9                                       M. James Lorenz
                                   United States District Court Judge

10

11  COPY TO:

12  HON. WILLIAM MCCURINE, JR.
    UNITED STATES MAGISTRATE JUDGE

13  ALL PARTIES/COUNSEL

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12cv1975